IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SHERRY HERPKA, | ) | CASE NO. 1:13CV2503 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Sherry Herpka ("Herpka") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties.  Doc. 14.

As set forth more fully below, the Administrative Law Judge ("ALJ") failed to explain why her RFC assessment differed substantially from the opinion of Dr. Hunt to which the ALJ indicated she gave considerable weight.  In addition, the Court is unable to determine whether substantial evidence supports the ALJ's Paragraph B Listings determination.  Accordingly, the Commissioner's decision is **REVERSED** and **REMANDED.**

### I. Procedural History

Herpka filed an application for DIB and SSI on May 16, 2011, alleging a disability onset date of January 1, 2011.  Tr. 182, 186.  She alleged disability based on the following: nerve damage in left hand, PTSD (post-traumatic stress disorder), depression and anxiety. Tr. 215.

After denials by the state agency initially (Tr. 122, 126) and on reconsideration (Tr. 131, 134), Herpka requested an administrative hearing.  Tr. 139.  A hearing was held before Administrative Law Judge ("ALJ") Pamela E. Loesel on June, 12, 2012.  Tr. 27-61.  In her July 19, 2012, decision (Tr. 10-21), the ALJ determined that there were jobs that existed in significant numbers in the national economy that Herpka could perform, i.e., she was not disabled.  Tr. 19.  Herpka requested review of the ALJ's decision by the Appeals Council (Tr. 6) and, on September 19, 2013, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A.  Personal and Vocational Evidence

Herpka was born in 1971 and was 39 years old on the date her application was filed.  Tr. 215.  She completed tenth grade and is able to communicate in English.  Tr. 214, 216.  She has past relevant work as a child care provider.  Tr. 45.  She last worked in 2008.  Tr. 39.

### B.  Relevant Medical Evidence

#### 1.  Physical

On September 20, 2005, Herpka sought treatment after she cut the middle finger on her left hand with glass.  Tr. 271-272.  Mehrun K. Elyaderant, M.D., an orthopedic doctor, diagnosed her as having a zone two tendon injury with digital nerve injury. Tr. 271.  Dr. Elyaderant performed surgery on September 22, 2005, to repair the tendon and nerve.  Tr. 274.

In July 2008, Herpka sprained a ligament in her left thumb.  Tr. 289-290.  She underwent surgery to repair the ulnar collateral ligament of her left thumb metacarpaphalangeal joint on August 5, 2008.  Tr. 291-292.

On September 23, 2011, Herpka saw Daniel Shank, M.D., a family physician, for a general check-up.  Tr. 371.  She complained of problems "from injury and nerve repair on [her] left hand."  Tr. 371.  Upon examination, Herpka had reduced sensation in her left hand.  Tr. 373. Dr. Shank diagnosed her with numbness and tingling in her left hand.  Tr. 373.

On March 5, 2012, Herpka saw Dr. Shank again to have medical forms filled out for physical therapy on her left hand.  Tr. 453.  She reported ongoing hand function problems and said she last saw an orthopedic doctor in 2008.  Tr. 453.  Upon examination, Dr. Shank found that Herpka had limited flexing in her left index finger.  Tr. 453.  He diagnosed her with bilateral carpel tunnel syndrome.  Tr. 453.

### 2.  Mental

On December 13, 2010, Herpka visited the Center for Families and Children (CFC) for a mental health assessment.  Tr. 303-315.  She reported that she was diagnosed in 1999 with PTSD stemming from domestic abuse by her ex-husband.  Tr. 308.  She also reported sexual abuse as a child.  Tr.306.  Upon mental status examination, Herpka was found to be clean, neat, and groomed.  Tr. 313.  She was spontaneous and talkative and had good eye contact.  Tr. 313. Her mood was depressed.  Tr. 313.  Her motor activity was calm, her affect was appropriate, her thought process was goal directed and circumstantial, and her thought content and perception were normal.  Tr. 313.  She was alert and oriented and had good concentration.  Tr. 313.  Herpka reported that she had been reluctant to try medications in the past but was ready to try them at this time.  Tr. 314.  She was diagnosed with Major Depression, Generalized Anxiety Disorder, PTSD and Obsessive Compulsive Disorder (OCD), and was assigned a Global Assessment of Functioning (GAF) Score of 55.[1]  Tr. 315.

---

[1]  GAF (Global Assessment of Functioning ) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: Diagnostic & Statistical

On June 7, 2011, Herpka returned to CFC for an individualized service plan.  Tr. 17-18. She reported crying daily, having difficulty sleeping, isolating herself from others, having difficulty leaving the house, and relationship issues with her children.  Tr. 317.  She also complained of depression and feeling guilty.  Tr. 318.  Herpka was advised to maintain her appointments, learn breathing techniques, and reach out to supports.  Tr. 318.

On September 22, 2011, Herpka went to CFC and saw therapist Kristen Hanvey, CNP, CCIT.  Tr. 350-51.  Herpka's appearance was neat and clean and her thought process was organized.  Tr. 354.  She had no delusions or paranoia although she reported passive thoughts of suicide.  Tr. 354.  Her cognition, insight, and judgment were normal.  Tr. 354.  Her mood was nervous and she was talkative.  Tr. 354.  Hanvey diagnosed her with major depressive disorder, assessed a GAF score of 50-55,[2] and prescribed Wellbutrin.[3]  Tr. 324, 349, 351.

Herpka visited CFC again on October 7, 2011.  Tr. 353.   Her appearance was neat and clean and she reported some improvement in symptoms.  Tr. 353.  Upon mental status examination, she had fast, clipped speech and was speaking in run-on sentences.  Tr. 353.  Her thought content was organized and linear although she exhibited "some jumping from topic."  Tr. 353.  Her mood was anxious.  Tr. 353.  Her cognition, insight and judgment were within normal limits.  Tr. 353.   The record notes that she made minimal progress on Wellbutrin.  Tr. 353.  The

---

Manual of Mental Health Disorders, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id*.

[2]  A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  DSM-IV-TR at 34.

[3]  Wellbutrin is an anti-depressant.  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 261, 2079.

note also indicates that she was non-compliant with her medication.  Tr. 353.  Buspar was added for anxiety.[4]  Tr. 353.

On November 4, 2011, Herpka saw Hanvey again.  Tr. 353.  Herpka reported that she had not been taking her medication because she ran out and did not get it refilled.  Tr. 352.  Her appearance was casual and clean.  Tr. 352.  She displayed pressured speech and was overly talkative.  Tr. 352.  She complained of being paranoid about her daughter's health.  Tr. 352.  Her mood was anxious and her cognition, insight and judgment were within normal limits.  Tr. 352.

On December 9, 2011, Herpka complained to Hanvey that she was anxious because she was worried about her pregnant daughter and her son's heart condition.  Tr. 396.  She reported decreased anxiety after taking Buspar.  Tr. 396.  Her appearance was casual and clean, she had no suicidal ideation, her cognition was good, and her insight and judgment were fair.  Tr. 396.  She was paranoid that something would go wrong.  Tr. 396.  Hanvey commented that Herpka was "somewhat scattered—stressed—verbose w[ith] tangential speech."  Tr. 396.  She was anxious about life stressors but showed some improvement in symptoms.  Tr. 396.  She wanted to maintain her current medication. Tr. 396.

On December 12, 2011, Herpka saw Dr. Shank and reported that she was doing well on her anxiety medication and that she felt better, although she reported that she still had a lot of stressors.  Tr. 447.

On February 15, 2012, Herpka's treatment notes from CFC show that her Paxil medication, which she had been prescribed in January 2012, was discontinued because of nausea and vomiting.[5]  Tr. 406, 395.  She was prescribed Lexapro instead.[6]  Tr. 406.  Herpka's

---

[4]  Buspar is used to treat anxiety disorders.  *See* Dorland's at 265.

[5]  Paxil is used to treat depressive disorder, OCD, and social anxiety disorders.  *See* Dorland's at 1384, 1399.

appearance was clean and neat and her thought process was organized and linear.  Tr. 406.  She

was worried about her daughter's health. Tr. 406.  She reported that her mood was

"overwhelmed." Tr. 406.  Her behavior was pleasant, her cognition was grossly intact, and her

insight and judgment were good.  Tr. 406.  The assessor observed that Herpka had severe

psychological stressors and that she was anxious and depressed.  Tr. 406.

On March 28, 2012, Herpka's treatment notes from CFC show that she improved on

Lexapro.  Tr. 405.  She reported that her daughter gave birth the previous month.  Tr. 405.  Upon

examination, Herpka was clean and neat, her thought process was organized and linear, her

perception was normal, her behavior was pleasant and anxious, her cognition was grossly intact,

and her insight and judgment were fair.  Tr. 405.  She had been compliant with her medications.

Tr. 405.  She was assessed as stable and was encouraged to seek supportive therapy.  Tr. 405.

On April 25, 2012, Herpka reported to CFC that she was only taking her medication three

out of seven days a week because she "did not know" and "thought I should only take them when

I feel bad." Tr. 459.  She complained that she was "in a panic a lot" and that her daughter had

been upsetting her.  Tr. 459.  Herpka's appearance was clean and neat, her thought process was

organized and linear, her thought content and perceptions were normal, her affect was full, her

mood was stressed, her behavior was pleasant, her cognition was grossly intact, and her insight

and judgment were fair.  Tr. 459.  She was assessed as stable and counseled to comply with her

medications.  Tr. 459.

### C.  Medical Opinion Evidence

#### 1.  Treating Source Opinion

On March 28, 2012, Andrew Hunt, M.D., of CFC, completed a form entitled "Medical

Source Statement: Patient's Mental Capacity." Tr. 409-410.  Dr. Hunt opined that Herpka had a

---

[6]  Lexapro is an anti-depressant.  *See* Dorland's at 647, 1032.

"very good" ability to understand, remember and carry out simple job instructions and maintain appearance.  Tr. 409-410.  She had a "good" ability to follow work rules; respond appropriately to changes in routine setting; understand, remember and carry out detailed job instructions; socialize; and manage funds and schedules.  Tr. 409-410.  However, she had only a "fair"[7] ability to use judgment; maintain attention, concentration and pace for extended periods of 2-hour segments; respond appropriately to changes in routine settings; deal with the public; relate to coworkers; interact with supervisors; function independently without special supervision; work in coordination with or proximity to others without being unduly distracted or distracting; deal with work stressors; understand, remember and carry out complex instructions; behave in an emotionally stable manner; relate predictably in social situations; and leave home on her own.  Tr. 409-410.  Dr. Hunt also indicated that Herpka had a "poor or none"[8] ability to complete a normal workday and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.  Tr. 410.

Dr. Hunt also completed a Medical Status Questionnaire on March 28, 2012.  Tr. 401-403.  He indicated that Herpka had a fair ability to remember, understand and follow directions, maintain attention, sustain concentration, persist at tasks, and complete tasks in a timely fashion, and adapt to pressure.  Tr. 402.  He commented that that Herpka's appearance was clean and neat, her speech was organized, linear, and goal directed, she had full affect, her cognitive functioning was grossly intact, and she had good insight and judgment.  Tr. 401.

### 2.  Consultative Examining Opinions

#### a.  Physical

---

[7]  The form defined "good" as "the ability to function in this areas is limited, but satisfactory."  Tr. 409.  "Fair" is defined as "the ability to function in this area is seriously limited but not precluded.  May need special consideration and attention."  Tr. 409.

[8]  "Poor or none" is defined as "no useful ability to function in a competitive setting.  May be able to perform in a sheltered setting."  Tr. 409.

On August 12, 2011, Edward Butler, M.D., conducted a consultative examination.  Tr. 335-340.  He noted that Herpka had surgery on her left hand.  Tr. 335.  He commented that she has residual numbness of the adjacent surfaces of her index and middle fingers in her left hand as well as limited motion of the left middle finger.  Tr. 335.  Herpka reported no pain in those fingers but residual pain at the base of her thumb.  Tr. 335.  She informed Dr. Butler that she cooks and cleans daily, washes laundry twice a week, shops twice a week, and showers and dresses independently every day.  Tr. 337.  Upon manual muscle testing, Herpka exhibited full strength.  Tr. 342.  An x-ray of her left hand was normal.  Tr. 341.  She had a reduced range of motion in her left middle finger.  Tr. 345.  She had "slight difficulty" using her left hand to fasten and unfasten a button.  Tr. 343.  Dr. Butler opined, "[t]here are mild limitations to fine coordination of the hands."  Tr. 340.

### b.  Mental

On July 14, 2011, Deborah Koricke, M.D., conducted a consultative examination.  Tr. 327-333.  Herpka reported that she had no problems getting along with coworkers, bosses and peers.  Tr. 329.  She acknowledged that she was previously treated with psychiatric medication but that she stopped taking it because it did not help.  Tr. 329-330.  She stated that she is afraid of men and does not like to leave the house.  Tr. 330.  She maintains her personal hygiene and household chores but has difficulty washing dishes and cutting things because of problems with her left hand.  Tr. 330.

Upon mental examination, Dr. Koricke found that Herpka had a good appearance, was clean, and that her hair was neatly styled.  Tr. 330.  She was cooperative and polite.  Tr. 330.  She was depressed and anxious and had some difficulty concentrating during portions of the testing, but she persisted to the end of the time limits.  Tr. 330.  She was open and forthright and

was believed to be telling the truth.  Tr. 330.  Her speech was organized, coherent, and relevant to the conversation.  Tr. 330.  She was able to express herself and was "fairly articulate."  Tr. 330.  Her memory for history was adequate and there was no evidence of a thought process disorder.  Tr. 330.  She was fully oriented and her thought process was not delusional; her abstract thinking and social judgment were within normal limits; and her intellectual functioning was in the low average range.  Tr. 331.  She had good insight and judgment.  Tr. 331.  She reported that she lived with her two children and that her typical day involved cleaning, calling doctors, and spending time with her children.  Tr. 331.  Dr. Koricke assessed a GAF score of 50. Tr. 332.

### 3.  State Agency Reviewing Opinions

#### a.  Physical

On September 8, 2011, Lynne Torello, M.D., a state agency reviewing physician, provided an opinion based on information in Herpka's record.  Tr. 69-70.  Regarding Herpka's physical Residual Functional Capacity ("RFC"), Dr. Torello opined that Herpka had mild limitations in her left hand with fine manipulation and that she could perform frequent bilateral fingering.  Tr. 70.

On December 16, 2011, Dimitri Teague, M.D., a second state agency physician, provided an opinion based on Herpka's record.  Tr. 98.  Regarding Herpka's physical RFC, Dr. Teague opined that Herpka had mild limitations in performing fine manipulation with her left hand and that she could perform frequent fingering with her left hand and constant fingering with her right hand.  Tr. 99.  He noted that Herpka had full strength in all muscle groups, her range of motion was normal for all extremities except her left middle finger, and that an x-ray of her left hand was normal.  Tr. 100.

### b.  Mental

On August 5, 2011, Frank Orosz, Ph.D., a state agency physician, reviewed Herpka's medical record.  Tr. 67-68.  Dr. Orosz found that Herpka had mild limitations in activities of daily living, moderate difficulties maintaining social functioning, and moderate difficulties maintaining concentration, persistence, or pace.  Tr. 68.

On December 19, 2011, Joseph W. Edwards, Ph.D., a second state agency physician, reviewed Herpka's medical record and completed a Psychiatric Review Technique and a mental RFC assessment for Herpka.  Tr. 96-97, 100-102.  Dr. Edwards found that Herpka had moderate restrictions in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace.  Tr. 97.  He opined that Herpka could perform three-to-four step tasks without high production quotas or strict time constraints and work that does not require long periods of sustained concentration.  Tr. 101.  He found that she could have occasional superficial interaction with co-workers and supervisors and can work in an environment with infrequent change.  Tr. 101-102.

### E.  Testimonial Evidence

### 1.  Herpka's Testimony

Herpka was represented by counsel and testified at the administrative hearing.  Tr. 29-56. She testified that she lives with her eighteen-year-old son, her twenty-year-old daughter, and her daughter's baby.  Tr. 35-36.  Herpka testified that she worked from 2000-2008 "doing daycare." Tr. 39-40.  She stopped working because her children got sick often and she "constantly had to take them to counseling."  Tr. 39-40.

She testified that her biggest problem working full time now is her hands.  Tr. 54.  Her hands swell and she does not know if she is going to drop or break things.  Tr. 54.  She also

panics with anxiety when her children get sick, feels bad when she makes mistakes, and forgets things.  Tr. 54.  She stated that she was told that her PTSD factors into her panic attacks and testified that she gets flashbacks when her daughter gets sick and when she has to go to court on a matter involving her ex-husband.  Tr. 54-55.

Herpka testified that her middle and index finger on her left hand swell, are stiff, and "feel frozen."  Tr. 39.  She cannot feel them and they do not bend all the way.  Tr. 39.  She had surgery on her thumb and her thumb remains painful.  Tr. 38-39, 44.  She uses her right hand for most things because she is not sure when her left hand will act up.  Tr. 44.  She testified that she could pick up a coin on a table by using her left thumb, left ring finger and left pinkie finger.  Tr. 46.

Herpka stated that she does not leave her house often because she has no driver's license.  Tr. 51.  She is unable to get a driver's license because of vision problems.  Tr. 37, 53.  When she needs to go somewhere she relies on her daughter, sister, family members, counselor, and neighbors, or she walks.  Tr. 37.  The day of the hearing, she took public transportation with a male friend.  Tr. 37.

She does not socialize because she feels like she is a negative person.  Tr. 51.  She breaks up often with her boyfriend because of her negativity and because he does not like it that her son and daughter have significant medical problems.  Tr. 51.  She does not like to use public restrooms because she feels there are a lot of germs.  Tr. 51.  Her children picked up on her behavior and also have problems with germs and excessive hand washing.  Tr. 52.

Herpka testified that she suffers from paranoia when her daughter gets sick and she has to call "50 people trying to find a ride."  Tr. 49.  She gets depressed when her daughter gets sick and because she is unable to do things she used to, like cooking.  Tr. 50.  She stated that she is

11

never really happy, but that she becomes functional and can "get up and clean." Tr. 50. She turns the radio on and cleans until she gets tired. Tr. 50. She takes frequent breaks. Tr. 50. She is intimidated by some men, especially her ex-husband who lives near her, and if she feels there are a lot of people around she does not like to disagree with them. Tr. 48.

Herpka can cook "anything in the microwave on top of the stove" but has a problem lifting things into the oven. Tr. 37. She does laundry and washes most types of dishes. Tr. 37. She vacuums and showers but needs some help from her daughter shaving. Tr. 38. She can hold her grandson and change his diaper, although she has trouble with the tape because her fingers don't bend. Tr. 38.

### 2.  Vocational Expert's Testimony

 Vocational Expert Mary Harris ("VE") testified at the hearing. Tr. 56-60. The ALJ discussed with the VE Herpka's past relevant work as a child care provider. Tr. 57. The ALJ asked the VE to determine whether a hypothetical individual of Herpka's age, education and past relevant work experience could perform the job she performed in the past if that person had the following characteristics: can occasionally lift fifty pounds; can frequently lift twenty-five pounds; can stand and walk for six hours in an eight-hour workday; can sit for six hours in an eight-hour workday; can push or pull without limit; can frequently finger bilaterally; can perform three to four-step tasks or unskilled work without high production quotas or strict time constraints and with infrequent change; and can have superficial interaction with both co-workers and supervisors. Tr. 57-58. The VE testified that the person could not perform Herpka's past relevant work as a child care provider. Tr. 58. The ALJ asked the VE if there are other jobs that the person could perform, and the VE testified that the person could perform jobs as a laundry worker (400,000 national jobs, 22,000 Ohio jobs, 3,900 Cleveland, Ohio jobs), cleaner

(1,000,000 national jobs, 20,000 Ohio jobs, 12,000 Cleveland, Ohio jobs), and machine operator (200,000 national jobs, 14,000 Ohio jobs, 2,400 Cleveland, Ohio jobs).  Tr. 58-59.

Next, the ALJ asked the VE to determine whether there was any work that the same hypothetical individual could perform if that individual would be off task at least fifteen percent of the time due to problems with anxiety, "post-traumatic, and/or depression."  Tr. 59.  The VE answered that there were no jobs that such an individual would be able to perform. Tr. 59.

Herpka's attorney asked the VE to consider a hypothetical individual with the characteristics previously described by the ALJ in the first hypothetical but who can only occasionally handle with the left hand and frequently handle with the dominant hand.  Tr. 59-60.  The VE answered that there are no jobs for such an individual.  Tr. 47.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

 In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[9] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In her July 19, 2012, decision, the ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2012.  Tr. 12.

2.    The claimant has not engaged in substantial gainful activity since January 1, 2011, the alleged onset date.  Tr. 12.

---

[9] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

3.      The claimant has the following severe impairments: carpal tunnel syndrome in the non-dominant left hand, affective disorder (depression), and anxiety-related disorder (generalized anxiety disorder and post-traumatic stress disorder).  Tr. 12.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 13.

5.      The claimant has the residual functional capacity to perform less than a full range of medium work with the following additional limitations. The claimant is able to occasionally lift 50 pounds and frequently lift 25 pounds.  She is able to stand and walk 6 hours of an 8-hour work day. She is able to sit for 6 hours of an 8-hour work day.  She has the unlimited ability to push and pull. She can perform frequent fingering bilaterally. She can remember and perform 3-4 step tasks (i.e., unskilled work). She can perform work without high production quotas or strict time constraints. She can have occasional superficial interactions with coworkers and supervisors. She can perform work in an environment with infrequent changes.  Tr.16.

6.      The claimant is unable to perform any past relevant work.  Tr. 18.

7.      The claimant was born on November 19, 1971 and was 39 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 19.

8.      The claimant has a limited education and is able to communicate in English.  Tr. 19.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  Tr. 19.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 19.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2011, through the date of this decision.  Tr. 20.

## V. Parties' Arguments

Herpka objects to the ALJ's decision on three grounds.  She asserts that the ALJ (1) improperly weighed the medical opinion evidence with respect to Herpka's mental limitations and failed to give good reasons for the weight given to the opinions of Drs. Hunt and Koricke; (2) failed to explain why she found that Herpka did not meet the paragraph B criteria for Listings 12.04 and 12.06; and (3) assessed a physical RFC that was not supported by the evidence.  In response, the Commissioner submits that substantial evidence supports both the ALJ's consideration of the medical source opinions pertaining to Herpka's mental abilities and the ALJ's physical RFC assessment.  The Commissioner also asserts that substantial evidence demonstrates that Herpka did not meet or equal a listing.

### VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 20)03).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir.19)89) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 19)84).

### A. The ALJ failed to explain why her RFC assessment differed substantially from the opinion of Dr. Hunt

Herpka argues that, despite giving Dr. Hunt's opinion "considerable weight," the ALJ's RFC finding "exclude[s] any reference to Dr. Hunt's significant restrictions, finding serious

limitations, in almost all areas of functioning and a work-preclusive limitation in completing a normal workday or workweek."  Doc. 16, p. 10.  Specifically, Herpka points out that Dr. Hunt found her to have "serious limitations" in her ability to maintain attention and concentration, deal with the general public, work in coordination or proximity to others without being unduly distracted or distracting, behave in an emotionally stable manner, relate predictably in social situations and be able to leave home on her own.  Doc. 16, p. 11, Tr. 409-410.  Dr. Hunt also found that she had a "poor or none" ability to complete a normal workday or workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.  Doc. 16, p. 11, Tr. 410.

"It is well established that for a decision to stand, an ALJ is not required to discuss every piece of evidence in the record."  *Sinegar v. Comm'r of Soc. Sec.*, 2014 WL 861104, at *7 (N.D. Ohio March 5, 2014) (citing *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004)).  "However, Social Security Ruling 96–8p states: 'The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.'"  *Id.* (quoting S.S.R. 96–8p, 1996 WL 374184, at *7; *Fleischer v. Astrue*, 774 F.Supp.2d 875, 881 (N.D.Ohio 2011)).

With respect to Dr. Hunt's opinion, the ALJ stated,

The undersigned gives considerable weight to Dr. Hunt's treating source opinion to the extent described in this finding because he has had access to the claimant's longitudinal treatment history and her response to various treatment modalities.

Tr. 18.  When discussing her RFC assessment, the ALJ referenced Dr. Hunt's opinion that Herpka had an "unlimited" ability to perform simple job descriptions and a "good" ability to perform detailed but not complex job descriptions despite her symptoms from her mental

impairments.  Tr. 17.  The ALJ further commented that, in general, Dr. Hunt opined that

Herpka's mental impairments "have only caused 'fair' to no limitations" in her work-related

functioning.  Tr. 17.  The ALJ also gave "great" weight to the state agency consultants' mental

assessments because she found that they were consistent with the record as a whole and,

specifically, Dr. Hunt's opinion.  Tr. 18.

       Dr. Hunt's opinion form defines "fair" as the "ability to function in this area is seriously

limited but not precluded. May need special consideration and attention."  Tr. 409.  "Poor or

none" is defined as "no useful ability to function in a competitive setting.  May be able to

perform in a sheltered setting."  Tr. 409.  As such, Dr. Hunt's opinion actually found that Herpka

was severely limited and had no useful ability to complete a normal workday and perform at a

consistent pace.  Tr. 409-410.   Thus, the ALJ's RFC assessment conflicts with Dr. Hunt's

opinion.  Despite the ALJ giving Dr. Hunt's opinion "considerable" weight, it is not clear how

the ALJ assessed an RFC that is patently inconsistent with Dr. Hunt's opinion.  The ALJ

indicated that she credited Dr. Hunt's opinion "to the extent described in this finding" without

articulating what portion of his opinion, specifically, she did not give weight to and why she

chose not to credit it.  Tr. 18.  Moreover, it is not clear whether the ALJ understood that "fair" in

Dr. Hunt's opinion meant "severely limited" and, if so, how consideration of these severe

limitations affected the ALJ's RFC finding.

       The Commissioner argues that the ALJ accounted for Dr. Hunt's limitations regarding

Herpka's ability to handle complex job instructions by restricting her to work with only three-to-

four step tasks (i.e., unskilled work).  Doc. 17, p. 12.  The Commissioner also asserts that Dr.

Hunt's finding that Herpka had a poor or no ability to perform at a consistent pace was

accounted for because the ALJ's RFC assessment precluded jobs with high production quotas or

strict time constraints. Doc. 17, p. 12.  Although moderate limitations in pace may be accounted for by an RFC that limits the claimant to jobs without high production requirements, *see Sinegar, 2014 WL 861104,* at *8, Dr. Hunt found that Herpka had *no useful ability* to function at a consistent pace or to complete a work day without interruptions from psychologically based symptoms. Tr. 410.

The Commissioner does not argue that the other restrictions found by Dr. Hunt are accounted for in the RFC assessment.  For example, the RFC does not contain a restriction with respect to dealing with the public, the ability to leave home on one's own, or to behave in an emotionally stable manner, all of which Dr. Hunt found Herpka to be severely limited as to. Because, on its face, Dr. Hunt's opinion appears to be more limited than the ALJ found in her RCF assessment, the Court is unable to discern how the ALJ's RFC assessment reflects the considerable weight she purportedly gave to Dr. Hunt's opinion.

Herpka also argues that the ALJ found that Dr. Hunt was a treating physician but erroneously failed to explain why his opinion was not entitled to "controlling" weight.  Doc. 16, pp. 11-12.  A treating source is an acceptable medical source who provides, or has provided, a claimant with medical treatment or evaluation and who has had an ongoing treatment relationship with the claimant.  *See* 20 C.F.R. § 404.1502.  The Commissioner will generally consider there to be an "ongoing treatment relationship" when the medical evidence establishes that a claimant is or has been seen with a frequency consistent with accepted medical practice for the type of treatment or evaluation required for a claimant's medical condition.  *Id.*  "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once[.]"  *Kornecky*

*v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 507 (6th Cir. 2006) (quoting *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994)).  The plaintiff has the burden of showing that her doctor is a treating physician.  *See id.* at 506-508 (plaintiff failed to show doctor was a treating physician and, therefore, his opinion was not entitled to presumptive weight per the treating physician rule); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (claimant has the burden of proof in steps one through four).

The record is unclear as to whether Dr. Hunt was in fact a treating physician.  Although the ALJ referred to Dr. Hunt as a treating source, the ALJ did not state that Dr. Hunt had seen Herpka; the ALJ indicated only that Dr. Hunt "had access to claimant's longitudinal treatment history and [Herpka's] response to various treatment modalities."  Tr. 18.  Notably, Herpka does not assert that Dr. Hunt was her treating physician but only that the ALJ referred to Dr. Hunt as a treating physician.  Herpka does not identify any document in the record showing an occasion when she ever saw Dr. Hunt.  Accordingly, the ALJ was not required to explain why she did not give Dr. Hunt's opinion controlling weight. *See Daniels v. Comm'r of Soc. Sec.*, 152 Fed. App'x 485, 490-491 (6th Cir. 2005) (even though the ALJ referred to a doctor as a treating source, the doctor did not meet the requirements under the regulations to be defined as a treating physician and the ALJ's failure to specifically address that opinion was not error).

## B.  The ALJ gave appropriate weight to Dr. Koricke's opinion and explained her reasons

Herpka also contends that the ALJ failed to give appropriate weight to the opinion of consultative examiner Dr. Koricke.  Doc. 16, p. 12.  She argues that, because Dr. Koricke examined Herpka, her opinion is entitled to more weight than the state examiners' opinions, which the ALJ assigned "great" weight to.  Doc. 16, p. 2, Tr. 18.  Herpka's argument fails.

Although, generally, an examining source opinion is entitled to greater weight than a non-examining source opinion, *see* 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1), it is the ALJ's duty to resolve conflicts in the medical opinions. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir.1994).  The ALJ gave "partial weight" to Dr. Koricke's opinion "to the extent that she opined that the claimant's mental impairments have caused her no more than moderate difficulties in functioning and to the extent described in this finding."  Tr. 18.  The ALJ, therefore, explained what portions of Dr. Koricke's opinion she credited.  She specifically discussed portions of Dr. Koricke's opinion earlier in her decision when she found moderate limitations in concentration, persistence or pace, and referenced that discussion again.[10]  Tr. 15, 17.  She explained that Dr. Koricke opined that Herpka had "some difficult[y] maintaining her concentration during portions of the exam."  Tr. 15.  The ALJ noted Dr. Koricke's opinion that Herpka was functioning in the "low average range" of intelligence and that Herpka alleged obsessive-compulsive traits at the time of Dr. Koricke's examination.  Tr. 15.  The ALJ also discussed Herpka's non-compliance with her medications as being indicative of a greater level of functioning than alleged.  Tr. 17-18.  The ALJ commented that Herpka admitted only taking her medications when she was "feeling bad" and that she took her medications three days a week, suggesting that Herpka experienced an exacerbation of symptoms only three days a week despite non-compliance with medication.  Tr. 17-18.  Finally, the Court notes that Herpka does not identify any part of Dr. Koricke's opinion that describes more than moderate limitations in functioning. In sum, the ALJ adequately described the appropriate weight she assigned to Dr. Koricke's opinion.

### C.  The Court is unable to determine whether substantial evidence supports the ALJ's finding that the paragraph B criteria were not met

---

[10]  The ALJ's decision is to be read as a whole; she need not repeat findings in a later section that have already been discussed.  *See Jones v. Comm'r of Soc. Sec.*, 2012 WL727737, at *23 (N.D. Ohio March 6, 2012).

Herpka asserts that, "[o]nce appropriate weight is given to the opinion evidence of Dr. Hunt and Dr. Koricke, it must be found that the claimant's conditions meet the "B" Criteria of Listings 12.04 and 12.06."  Doc. 16, p. 14.  She contends that the ALJ "provides little to no analysis of the 'B' criteria" or why she found Herpka to be moderately limited with respect to the paragraph B criteria.  Doc. 16, p. 14.

In order to meet or medically equal Listings 12.04 (affective disorders) and 12.06 (anxiety related disorders), a claimant must satisfy the paragraph B criteria by showing she has at least two of the following:

> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listings 12.04B, 12.06B.  Specifically, Herpka challenges the ALJ's findings as to social functioning and concentration, persistence or pace.  Doc. 16, p. 15.

As explained, *supra*, Dr. Hunt's opinion found that Herpka had only a fair ability, i.e., that she had serious limitations, in her ability to function with respect to social functioning and concentration, persistence or pace.  Tr. 409-410.  Because the Court finds, as set forth above, that the ALJ did not appropriately explain the treatment she gave Dr. Hunt's opinion, the Court is unable to determine whether the ALJ's consideration of the paragraph B criteria is supported by substantial evidence.  On remand, the ALJ will have an opportunity to evaluate Dr. Hunt's opinion and, if necessary, shed additional light on Herpka's limitations under the paragraph B criteria.  *See Trent v. Astrue*, 2011 WL 841538, at * 7 (N.D. Ohio March 8, 2011) (declining to address the plaintiff's remaining assertion of error because remand was already required and, on

22

remand, the ALJ's treatment of opinion evidence might impact his findings elsewhere in his decision).

### D.  Substantial evidence supports the ALJ's physical RFC assessment

Herpka submits that the ALJ's physical RFC assessment limiting her to frequent fingering is not supported by substantial evidence.  Doc. 16, p. 18.  The Court disagrees.

The ALJ observed that Herpka underwent surgery on two fingers of her left hand in September 2005.  Tr. 13.  Although Herpka's surgeon recommended she undergo physical therapy after surgery, Herpka did not do so.  Tr. 13.  The ALJ found that Herpka's failure to seek treatment belied her allegations of disabling intensity, persistence and limiting effects of her hand impairment.  Tr. 17.  This was not error.  *See Watters v. Comm'r of Soc. Sec.*, 530 Fed. App'x 419, 424 (6th Cir. July 17, 2013) (an ALJ may take into account a claimant's failure to seek and follow a regular course of treatment, citing *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997)).

The ALJ commented that Herpka's records show that she complained about her hand impairment only twice since her surgery in 2005, both times after her alleged disability onset date of January 2011.  Tr. 13.  The first time was in August 2011 when she saw consultative examiner Dr. Butler.  Tr. 13.  Herpka reported to Dr. Butler that she had residual numbness in the area of her two fingers and limited range of motion of her middle finger.  Tr. 13.  The ALJ noted that Herpka did not complain of pain in these fingers.  Tr. 13.  The ALJ commented that, although Herpka complained to Dr. Butler that she had left thumb pain that kept her from sleeping at night, Herpka, again, failed to seek treatment for her symptoms.  Tr. 14.  The ALJ observed that Dr. Butler opined that Herpka had only mild limitations to fine coordination of the hands, and the ALJ gave this opinion "considerable" weight.  Tr. 14, 18.  The ALJ also

commented on Herpka's visit to Dr. Shank in March 2012, when Herpka reported, for the first

time, that she had functional problems with her hands.  Tr. 14.  The ALJ observed that, although

Dr. Shank diagnosed Herpka with bilateral carpal tunnel syndrome, there is no objective

evidence to confirm that diagnosis.  Tr. 14.  Finally, the ALJ gave partial weight to the opinions

of Drs. Torello and Teague to the extent the doctors assessed a physical RFC that limited Herpka

to frequent bilateral fingering.  Tr. 18.  Although Dr. Teague opined that Herpka could perform

constant fingering with her right hand and frequent fingering with her left hand, the ALJ limited

Herpka to frequent fingering with both hands.  Tr. 16.

Accordingly, substantial evidence supports the ALJ's RFC assessment limiting Herpka to

frequent fingering bilaterally, and her decision must be affirmed.  *See Jones*, 336 F.3d at 477.

### VII. Conclusion

For the reasons set forth herein, the decision of the Commissioner is **REVERSED** and

**REMANDED** for further proceedings consistent with this opinion.


Dated: December 15, 2014

Kathleen B. Burke
United States Magistrate Judge

24